# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 20-10343 (\_\_\_)<br><br>Joint Administration Pending |
| BOY SCOUTS OF AMERICA,<br><br>               Plaintiff,<br><br>     v.<br><br>A.A., *et al.*,[2]<br><br>              Defendants. | Adv. Pro. No. 20-50527 (\_\_\_) |

## DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF THE BSA'S MOTION FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

[2] A full list of the Defendants in this adversary proceeding is included in redacted form on Exhibit A to the BSA's Verified Complaint for Injunctive Relief [Adv. D.I No. 1] to protect the privacy interests of abuse victims. An unredacted version of the Complaint and Exhibit A thereto will be served on each Defendant's counsel.

Brian Whittman, being duly sworn, states the following under penalty of perjury:

1.  I am over twenty-one (21) years of age and I am fully competent to make this Declaration. I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a limited liability corporation, which has served as a restructuring advisor to the Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), since October 2018. I have twenty-five years of financial restructuring and bankruptcy experience.[3] I have served as a Managing Director in A&M's Restructuring & Turnaround group since 2008 and the group's co-head of the Midwest region since 2019. During my tenure at A&M I also served as interim chief financial officer of Horizon Global in 2018–19, chief restructuring officer of UCI International in 2016, and interim chief financial officer of PSAV, Inc. in 2014. Prior to joining A&M in 2002, I spent seven years working as a director in restructuring at a former "Big Five" accounting firm.

2.  On February 18, 2020, both of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. As the lead Managing Director at A&M responsible for this engagement since August 2019, I had a lead role in preparing the Debtors' chapter 11 filings, developing the Debtors' business plans, and providing diligence to and negotiating with certain of the Debtors' key constituencies. In doing so, I have familiarized myself with the Debtors' day-to-day operations, financial affairs, and books and records through review of certain financial documents and discussions with management.

---

[3] For the past twenty-five years I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution, manufacturing, media, mining and retail. I have also led complex engagements for companies, secured lenders and creditors, serving in both interim management and advisory roles. I am a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.

A. **Overview of BSA's Insurance Program Related to Sexual Abuse and Sexual Misconduct**[4]

3. To insure the BSA's many activities, the BSA maintained and maintains a broad insurance program. Specifically, the BSA purchased and continues to purchase commercial, general-liability ("CGL") primary, umbrella, and excess liability insurance policies to protect itself and various other entities from myriad risks, including claims arising out of sexual abuse or sexual misconduct. These CGL policies provided and continue to provide substantial coverage because a vast majority of the CGL policies are not exhausted and the limits of liability are still available.

4. With regard to the entities covered by these CGL policies, these policies provide coverage to, among others: (1) the BSA; (2) various local councils that effectuate the BSA's mission and are independently incorporated under the non-profit laws of their respective states (the "Local Councils"); and (3) various community and religious organizations, businesses and groups of individuals that organize the BSA's scouting units (the "Chartered Organizations").[5]

5. With regard to the limits of liability, significant limits of liability are still available to provide coverage to the BSA, Learning for Life, Local Councils and Chartered Organizations for claims arising out of sexual-abuse and sexual misconduct (the "Pending Abuse Actions"). Notably, between 1971 and the end of 1982, the CGL Policies were "per-occurrence" policies in that each claim of bodily injury that is covered by the policies is entitled to the applicable per-occurrence limits of liability without any applicable aggregate limit of liability. The "per-

---

[4] For the avoidance of doubt, the descriptions provided herein are intended to provide an overview of the BSA's insurance program. To the extent that the statements made herein in any way conflict or are expanded upon in the policies, the language in the policies control, and the BSA reserves any and all rights in that regard.

[5] Coverage under the CGL policies for these entities is subject to the same terms and conditions as coverage for the BSA, including not but limited to any limitations with regard to coverage. Moreover, for purposes of clarity, the parties set forth herein are not a comprehensive list of insureds under the CGL policies. Further, notwithstanding the defined terms herein, to the extent that these defined terms conflict with terms used in the various CGL policies, the terms in the various CGL policies control and are intended to be referenced herein.

occurrence" primary policies provide coverage for defense and indemnity costs for bodily injury claims (including the Pending Abuse Actions).

6. Between 1983 and the end of 1985, the BSA shifted its insurance program to policies that contained overall aggregate limits of liability. As a counterbalance to the imposition of applicable aggregate limits of liability, the BSA's procured towers of insurance (including significant excess insurance coverage) from 1983 to 1985 that provide significant limits of liability.

7. Notably, the BSA purchased insurance policies that provided at least $50.5 million in each of these years in available limits of liability. These CGL policies generally provide the BSA, the Local Councils, and Chartered Organizations coverage for bodily injury claims (including the Pending Abuse Actions), and a significant amount of the limits of liability are still available to provide coverage for, among other things, the Pending Abuse Actions.

8. Starting in 1986, the BSA substantially altered its insurance program; the primary and umbrella insurance policies procured were "fronting" policies. "Fronting" policies are policies where the deductibles match the policy's limit of liability.

9. Specifically, between 1986 and 2018, the CGL Policies contain a $1 million deductible that matches a $1 million limit of liability. Likewise, the umbrella "fronting" policies include a deductible that matches the aggregate limits of liability. Initially, the umbrella policies included a $1 million deductible that had a matching $1 million aggregate limit of liability, but starting in 2002, the deductible and the aggregate limit of liability increased to more than $1 million. Notably, between 2008 and 2018, the BSA's umbrella "fronting" policies included a deductible of $9 million and a matching aggregate limit of liability of $9 million. Historically, the deductibles for these "fronting" policies have been paid by the BSA.

10. Above these primary and umbrella "fronting" policies, the BSA procured significant excess insurance coverage that are not "fronting" policies. Certain of these excess policies have either been completely exhausted or partially eroded by prior claims, but there is still substantial excess insurance coverage available to the BSA, Learning for Life, the Local Councils, and Chartered Organizations. These excess CGL policies provide substantial coverage for bodily injury claims (including the Pending Abuse Actions).

11. With respect to any given policy year, at least some level of coverage under the CGL policies for each such year is available for bodily injury claims (including the Pending Abuse Actions).

**B.** **BSA's Insurance Coverage for the Local Councils and Chartered Organizations**

12. As noted above, a vast majority of the CGL Policies were intended to provide coverage not only to the BSA, but also the Local Councils and Chartered Organizations.[6]

13. Starting in 1971, certain of the Local Councils were added as additional insureds under the CGL policies. That list of local councils named as additional insureds increased over the years. In 1978, the CGL policies were amended such that the definition of the "Named Insured" included all of the Local Councils.

14. As both additional insureds and as "Named Insureds," the Local Councils have the same rights as the BSA to the limits of liability under those policies; thus, the limits of liability are "shared" between the BSA and the Local Councils.

---

[6] In addition to providing coverage to the BSA, Local Councils, and Chartered Organizations, the Learning for Life Program was established in 1991, and it was and continues to be insured under the BSA's CGL policies.

15. Similarly, starting in 1978, the BSA began to provide insurance coverage under its CGL policies to Chartered Organizations. Similar to the Local Councils, these Chartered Organizations "share" the limits of liability of the CGL Policies.

### C. Current Status of Pending Abuse Actions and BSA's Litigation Administration Approach

16. Currently, approximately 275 Pending Abuse Action are pending in 71 state and federal jurisdictions around the country. Historically, claims against the BSA, Learning for Life, an affiliated non-stock organization, and the Local Councils and Chartered Organizations, including the Pending Abuse Actions have, with very limited exception, been litigated and administered solely by the BSA.

17. This approach to litigation administration is a product of the relationship between the BSA, on the one hand, and Learning for Life, the Local Councils and Chartered Organizations, on the other, and the fact that some of the key allegations made by plaintiffs in the Pending Abuse Actions are substantially directed at the BSA. The BSA is necessarily involved in a wide variety of litigation matters, including, for example, responses to discovery requests, the overwhelming majority of which are directed at the BSA, which maintains the majority of records, as opposed to Learning for Life or any of the Local Council or Chartered Organization defendants.

18. In addition to responding to discovery, the BSA has facilitated the retention of joint defense counsel, coordinated with insurance carriers, and authorized and funded the payment of any settlement amounts related to the Pending Abuse Actions or similar, previously resolved, claims. Given the complexity of the issues involved the Pending Abuse Actions, and the BSA's central role in litigating them, the organization has retained national coordinating counsel to oversee the handling of the ever-increasing number of claims against the BSA, Learning for Life, the Local Councils, and the Chartered Organizations.

19. With the exception of certain registration records, the BSA possesses, manages and produces essentially all of the documentation relevant to the defense of the Pending Abuse Actions. Accordingly, absent a stay of discovery and litigation the BSA would be required to engage fully in the defense of Learning for Life, the Local Councils or Chartered Organizations, even as it attempts to resolve claims against itself in its bankruptcy case. The BSA's involvement would include formulating defense strategies, assisting in discovery, protecting against disclosure of privileged or otherwise protected documents, attending depositions, preparing witnesses and a myriad of other litigation tasks.

20. Furthermore, ongoing litigation in courts around the country – regardless of whether the litigation is nominally directed at non-debtor co-defendants – will greatly distract key personnel at the BSA from the critical task of negotiating with parties-in-interest to obtain a consensual plan of reorganization that timely and equitably compensates victims and fairly treats other stakeholders.

21. For example, prior to the Petition Date key BSA personnel including the legal, records management, membership standards and risk management departments devoted substantial time and energy to matters related to the Pending Abuse Actions.

22. Specifically, the BSA's Chief Financial Officer and General Counsel, must review, analyze, and approve settlements, strategies, and expenses with respect to the Pending Abuse Actions. In addition, the BSA's claims team members are generally responsible for monitoring and evaluating the status of the Pending Abuse Actions and the Director of Youth Protection and others are often required to testify in depositions in the Pending Abuse Actions.

23. These same key personnel will need to focus full-time on tasks related to the BSA's restructuring efforts, whether it is senior management participating in mediation and negotiations

with creditors, including abuse victims, or members of the BSA's claims team providing critical support with respect to the claims administration process in these Chapter 11 Cases.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18 day of February, 2020 in New York County.

_____
BRIAN WHITTMAN