## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| BOY SCOUTS OF AMERICA, | |
| Plaintiff, | Adv. Pro. No. 20-50527 (LSS) |
| v. | **Re:  Adv. D.I.s 6, 54, 72, 77, 107, 116** |
| A.A., *et al.*, | |
| Defendants. | |

### OPENING BRIEF IN SUPPORT OF THE BSA'S MOTION TO EXTEND PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 362

Dated:  February 22, 2021
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:  (312) 881-5400

*COUNSEL TO THE DEBTORS AND
DEBTORS IN POSSESSION*

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………………...1

STATEMENT OF FACTS…………………………………………………….…………...4

I.      FILING OF THE CHAPTER 11 CASES AND ADVERSARY PROCEEDING .......5

II.     RELATIONSHIP BETWEEN THE BSA AND THE BSA RELATED PARTIES......5

III.    THE PENDING ABUSE ACTIONS.............................................................................7

IV.     ISSUANCE AND PRIOR EXTENSIONS OF THE PRELIMINARY INJUNCTION 7

V.      OTHER CASE DEVELOPMENTS ............................................................................11

        A.      The Ongoing Mediation ................................................................................13

        B.      Passage of the Bar Date and Ongoing Claims Evaluation ............................15

LEGAL ARGUMENT…………………………………………………………………16

I.      THE COURT HAS SUBJECT MATTER JURISDICTION .......................................17

II.     THE INJUNCTION SHOULD BE FURTHER EXTENDED ....................................18

        A.      "Unusual Circumstances" Continue to Warrant Extending the Stay..............18

                1.      The BSA Related Parties Share an Identity of Interests with the
                        Debtors...............................................................................................19

                2.      Continuation of the Pending Abuse Actions and Further Abuse
                        Actions Would Adversely Impact the Debtors' Ability to Reorganize.20

        B.      The Traditional Elements for Injunctive Relief Continue to be Satisfied .......23

                1.      The Debtors are Likely to Successfully Reorganize...........................23

                2.      Without the Injunction, the Debtors Would be Irreparably Harmed ...24

                3.      The Balance of Harms Weighs in the Debtors' Favor........................26

                4.      The Public Interest Favors the Requested Relief................................27

CONCLUSION ................................................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.H. Robins Co. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ...........................................................................................19, 27

*Bank of the W. v. Fabtech Indus. (In re Fabtech Indus.)*,
  2010 Bankr. LEXIS 5097 (B.A.P. 9th Cir. 2010) ...................................................................24,

*In re Celotex Corp.*,
  123 B.R. 917 (Bankr. M.D. Fla. 1991) ...................................................................................27

*In re Phila. Newspapers, LLC*,
  407 B.R. 606 (E.D. Pa. 2009) ................................................................................................20

*In re R & G Fin. Corp.*,
  441 B.R. 401 (Bankr. D.P.R. 2010) ......................................................................................20

*Lane v. Phila. Newspapers, LLC (In re Phila. Newspapers, LLC)*,
  423 B.R. 98 (E.D. Pa. 2010) ..................................................................................................23

*Lomas Fin. Corp. v. Northern Tr. Co. (In re Lomas Fin. Corp.)*,
  117 B.R. 64 (S.D.N.Y. 1990)..................................................................................................26

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs., Inc. (In re Lyondell Chem. Co.)*,
  402 B.R. 571 (Bankr. S.D.N.Y. 2009)....................................................................................24

*Martillo v. Paladini (In re CD Liquidation Co.)*,
  462 B.R 124 (Bankr. D. Del. 2011) .......................................................................................23

*McCartney v. Integra Nat'l Bank N.*,
  106 F.3d 506 (3d Cir. 1997)............................................................................................19, 21

*Midway Games, Inc. v. Anonuevo (In re Midway Games)*,
  428 B.R. 327 (Bankr. D. Del. 2010) ......................................................................................19

*Pacor, Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984)....................................................................................................17

*Rickel Home Ctrs., Inc. v. Baffa (In re Rickel Home Ctrs.)*,
  199 B.R. 498 (Bankr. D. Del. 1996) ......................................................................................27

*SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*,
  388 B.R. 579 (Bankr. D. Del. 2008) ......................................................................................12

*W.R. Grace & Co. v. Baffa (In re W.R. Grace & Co.)*,
    386 B.R. 17 (Bankr. D. Del. 2008) ................................................................................. *passim*

## FEDERAL STATUTES

11 U.S.C. § 105(a) ................................................................................................................18

## FEDERAL RULES

Fed. R. Civ. P. 65 ................................................................................................................18

## OTHER AUTHORITIES

Aug. 16, 2017 Hr'g Tr., *TK Holdings, Inc. v. Hawaii (In re TK Holdings, Inc.)*,
    Adv. No. 17-50880-BLS (Bankr. D. Del. Aug. 23, 2017) .................................................25, 26

The Boy Scouts of America (the "**BSA**"), the non-profit corporation that is, along with its affiliate Delaware BSA, LLC (together, the "**Debtors**"), a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submits this opening brief in support of its motion (the "**Motion**") for an order, under 11 U.S.C. §§ 105(a) and 362, substantially in the form annexed as Exhibit A to the Motion (the "**Proposed Order**"), extending the Termination Date of the preliminary injunction (the "**Preliminary Injunction**") entered by the Court on March 30, 2020, pursuant to the *Consent Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* (the "**Consent Order**") [Adv. D.I. 54] and thereafter extended by stipulations approved by the Court on May 18, 2020, June 9, 2020, and November 18, 2020 [Adv. D.I. 72, 77, 116], which enjoin the prosecution of sexual abuse or misconduct claims related to the Chapter 11 Cases against the BSA Related Parties.[2]

## PRELIMINARY STATEMENT

1.      From day one, a core component of the Debtors' restructuring efforts has been to ensure that the non-debtor BSA Related Parties that are critical to the Debtors' operations and successful reorganization, including Local Councils and certain Chartered Organizations, are protected by the bankruptcy stay.  A pause of litigation against these non-debtors is essential not only so that they can focus their resources on being a constructive part of the Debtors' reorganization, but to safeguard the Debtors' own rights to a meaningful breathing spell. Because of this, the Debtors sought and obtained the Consent Order granting the Preliminary Injunction, which extended the stay to cover hundreds of lawsuits across the country as against the BSA Related Parties in addition to the BSA.  The unusual circumstances of these Chapter 11

---

[2] Capitalized terms used but not yet defined have the meanings later set forth in this Motion.  Capitalized terms used but not defined herein have the meanings ascribed to them in *The BSA's Opening Brief in Support of Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Adv. D.I. 7].

Cases, which now involve tens of thousands of abuse claims that implicate the BSA Related Parties as well as the Debtors, necessitate this relief.  Indeed, maintaining the Preliminary Injunction is vital to the Debtors' restructuring efforts for several reasons, including to enable Local Councils and Chartered Organizations to participate in the ongoing mediation and ultimately make a substantial contribution to a settlement trust under a plan of reorganization that provides for a global resolution of Scouting-related abuse claims.  If the Preliminary Injunction were to terminate and abuse litigation were permitted to resume in courts across the country, it would significantly impair, if not render impossible, the Debtors' ability to both equitably compensate survivors of abuse in Scouting and ensure that the BSA can continue to carry out its charitable mission.

2.    The Debtors, the estates' professionals, and dozens of parties in interest have worked tirelessly over the past year to achieve the Debtors' restructuring imperatives.  Toward that end, the TCC and UCC supported the Consent Order, which granted the Preliminary Injunction, thereby extending the protections of the automatic stay to the BSA Related Parties through the Termination Date.  As the Chapter 11 Cases progressed, the TCC and UCC agreed to several extensions of the Termination Date, including most recently up to and including March 19, 2021.  But now, with that date fast approaching, the TCC has rejected this consensual process and compelled the Debtors to proceed by motion.

3.    The TCC has rebuffed the BSA's repeated efforts to engage the TCC regarding a further stipulated extension in furtherance of the ongoing plan mediation process.  For several weeks approaching the deadline to file a stipulation to extend the Termination Date, the Debtors repeatedly asked the TCC about the terms of an extension.  The Debtors were met with no substantive response from the TCC until *one business day* before the February 22, 2021 deadline

2

to file a stipulation or motion to extend the preliminary injunction. While the TCC's specific demands are protected by mediation confidentiality, the TCC is dissatisfied with the status and extent of Local Councils' document productions and cooperation with the TCC's further demands.[3]  This is despite the production of approximately 327,000 pages of documents to the TCC regarding Local Councils' assets, the nature of restrictions thereon, and historical transactions.  Throughout the Chapter 11 Cases, Local Councils have steadfastly cooperated with the TCC's requests even amidst the COVID-19 pandemic, which precipitated one of the most challenging periods in the history of Scouting.  Moreover, the TCC has had thousands of hours of conferences with the Debtors, the Ad Hoc Committee, and individual Local Councils' representatives.

4.       The dissonance between the TCC's refusal to consent to a reasonable extension of the Termination Date and its expectations for Local Council participation in the Debtors' reorganization process is remarkable.  The TCC is effectively speaking out of one side of its mouth to demand complete Local Council participation while attempting to destroy the Local Councils' very means for doing so out of the other.  The result for which the TCC is effectively advocating would produce an illogical end to the Preliminary Injunction that would have grave consequences for the Debtors' restructuring efforts, as well as jeopardize the prospect of meaningful recoveries for survivors of abuse in the Chapter 11 Cases.

5.       Rather than recognize the manifest need to preserve limited estate resources and continue to work productively with the Debtors and other parties to achieve the best possible result for its constituency, the TCC has concluded that requiring the BSA to file a contested motion is in the best interests of abuse survivors.  In reality, however, the TCC's decision is

---

[3] The TCC has authorized the BSA to make this representation regarding its position.

directly contrary to the interests of abuse survivors and the estates.  Failure to obtain an extension of the Termination Date would irreparably harm the Debtors' efforts to successfully reorganize and to maximize creditor recoveries through a global resolution of Scouting-related abuse claims.

6.      The TCC is apparently willing to gamble with the fortunes of abuse survivors and the Debtors when the stakes are highest.  It is with their entire reorganization hanging in the balance that the Debtors are now forced to move to extend the Preliminary Injunction.  The Debtors seek this relief to afford all of the parties who have come to the table in these Chapter 11 Cases sufficient time to culminate their efforts to formulate and confirm a plan of reorganization.

7.      The TCC should not prevail in its opposition to an extension of the Preliminary Injunction, as the development of these Chapter 11 Cases has only solidified the legal basis for the Preliminary Injunction.  As set forth below, unusual circumstances remain present, both because the BSA shares an identity of interest with the BSA Related Parties and because prosecution of the Pending Abuse Actions and the Further Abuse Actions, which involve overlapping claims against the BSA and BSA Related Parties, will have a dramatically adverse impact on the BSA's ability to reorganize.  The traditional four-factor test for preliminary injunctive relief is also satisfied, with: (1) the Debtors and various parties-in-interest working together toward a successful reorganization; (2) the Debtors facing irreparable harm without the extension; (3) the balance of harms supporting the continued protections of the injunction; and (4) the public interest, including the promotion of viable reorganizations, favoring relief.

8.      With or without the TCC's consent, it is essential that the Motion be granted, the Termination Date be further extended, and the Debtors receive a fair opportunity to successfully reorganize.

## STATEMENT OF FACTS

### I.    FILING OF THE CHAPTER 11 CASES AND ADVERSARY PROCEEDING

9.    On February 18, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  [D.I. 1.]

10.    Contemporaneously with the filing of the petitions, the BSA instituted this adversary proceeding and filed its corresponding *Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Adv. D.I. 6] (the "**Preliminary Injunction Motion**"), seeking to extend the scope of the automatic stay to actions against non-debtor defendants.  [*See* Adv. D.I. 1, 5, 6, 7.]  Specifically, the BSA sought to extend the stay to enjoin the prosecution of Pending Abuse Actions against itself and the BSA Related Parties, to the extent those actions were not already subject to the automatic stay.  *See The BSA's Opening Brief in Support of Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Adv. D.I. 7] ("**Preliminary Injunction Motion Opening Brief**") at 1.

### II.    RELATIONSHIP BETWEEN THE BSA AND THE BSA RELATED PARTIES

11.    The BSA Related Parties include non-debtor Learning for Life ("**LFL**"), a non-stock organization affiliated with the BSA, and other non-debtor related entities that have been chartered by the BSA, including local councils that are independently incorporated under the non-profit laws of their respective states (collectively, the "**Local Councils**") and civic, faith-based, educational or business organizations, governmental entities or organizations, and other entities, organizations or groups of individual citizens that operate, sponsor, or support Scouting units under the BSA charter (collectively, the "**Chartered Organizations**," and together with the Local Councils and LFL, the "**BSA Related Parties**").

12.     The BSA and the BSA Related Parties work in close coordination in furtherance of the BSA's charitable mission. *See Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 16] (the "**First Day Declaration**") ¶¶ 18-22. In order to carry out that mission, the BSA grants charters to thousands of Chartered Organizations. *Id.* ¶ 19. These Chartered Organizations, in turn, form Scouting units, like "packs" for Cub Scouts or "troops" for Scouts BSA. *Id.* Scouting units are led by adult volunteers appointed by their affiliated Chartered Organization. *Id.*

13.     Each of the BSA's more than 81,000 Scouting units in the United States as of the Petition Date is organized, registered, and supported by a Local Council assigned to the geographic area in which the unit is located. *Id.* As of the date hereof, there are approximately 252 Local Councils across the country. *Declaration of Brian Whittman in Support of the BSA's Motion to Extend Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362* (the "**Whittman PI Extension Declaration**") ¶ 3. The primary function of Local Councils is to recruit and oversee the Chartered Organizations and to own and operate local camp grounds that are part of delivering the BSA's outdoor programming. First Day Declaration ¶ 19. Local Councils also recruit Scouts and collect and pay membership fees to the BSA that are an important source of its revenues. *See id .*¶¶ 19, 21, 22.

14.     Although the Local Councils are generally financially independent from the BSA, the BSA does use its national reach and resources to provide certain corporate and administrative support services to Local Councils in exchange for certain fees and reimbursements, as well as for the assistance of Local Councils in collecting membership fees and delivering the Scouting mission. *Id.* ¶ 21. This support includes, among other things, human resources, access to

training facilities, marketing services, and general insurance liability coverage. *Id.*; *see also* Preliminary Inj. Mot. Opening Br. at 10-12.

### III.    THE PENDING ABUSE ACTIONS

15.    The Pending Abuse Actions—the actions that are the subject of the Preliminary Injunction Motion—are lawsuits filed in state and federal courts across the country, alleging sexual abuse or misconduct arising out of the victim's involvement or connection with the BSA, but including BSA Related Parties as named defendants. *See* Preliminary Inj. Mot. Opening Br. at 1, 6-10. As of the Petition Date and the filing of the Preliminary Injunction Motion, there were approximately 275 such lawsuits. *See* First Day Decl. ¶ 7. That number has more than tripled since the Petition Date, with approximately 860 such lawsuits now pending and subject to the Preliminary Injunction. Whittman PI Extension Decl. ¶ 6.

### IV.    ISSUANCE AND PRIOR EXTENSIONS OF THE PRELIMINARY INJUNCTION

16.    On March 30, 2020, after notice and a hearing, the Court entered the Consent Order, which granted the Preliminary Injunction Motion and stayed each of the Pending Abuse Actions identified on Schedule 1 attached thereto as to the BSA Related Parties identified on Schedule 2 thereto, up to and including May 18, 2020 (as may be and has been extended, the "**Termination Date**"). Consent Order ¶¶ 3, 10. The Consent Order also specifically provided that the injunction imposed thereby would not prohibit the filing of a complaint to commence an action against a BSA Related Party alleging claims substantially similar to those asserted by plaintiffs in the Pending Abuse Actions (the "**Further Abuse Actions**"). *Id* ¶ 7.

17.    The Consent Order provides for the amendment of Schedules 1 and 2 in certain circumstances. As for Schedule 1, approximately every thirty (30) days following entry of the Consent Order, the BSA is directed to file an amended Schedule 1 that includes additional

Further Abuse Actions subject to the Consent Order. *Id.* ¶ 11. As for Schedule 2, additional parties (the "**Additional BSA Related Parties**") may be added with the consent of the BSA, the Official Tort Claimants' Committee (the "**TCC**"), and the Official Committee of Unsecured Creditors (the "**UCC**," and together with the TCC, the "**Committees**"), and as a result thereof be deemed beneficiaries of the Consent Order. *Id.* ¶ 10.

18.    Both Schedules 1 and 2 have been amended on several occasions consistent with those provisions. [*See, e.g.*, Adv. D.I. 68, 81, 91, 96, 101, 118, 133, 141 (notices of amended versions of Schedule 1); Adv. D.I. 92, 97, 125, 135, 142 (notices of amended versions of Schedule 2).] Currently, there are approximately 860 Pending Abuse Actions and Further Abuse Actions pending in over 110 state and federal courts around the country. *See Notice of Filing of Amended Schedule 1 to Consent Order* [Adv. D.I. 141]; Whittman PI Extension Decl. ¶ 6. Approximately 600 of those actions were instituted after the BSA filed the Preliminary Injunction Motion. *See Notice of Filing of Amended Schedule 1 to Consent Order* [Adv. D.I. 141]; Whittman PI Extension Decl. ¶ 6.

19.    The Consent Order also included, at paragraph 12, specific procedures for extension of the Termination Date by mutual agreement, as follows:

> 12.    The Termination Date may be extended by mutual agreement between the BSA, the UCC and the Tort Claimants' Committee, which shall be memorialized in a stipulation filed with the Court (an "Extension Notice") and served on plaintiffs to Pending Abuse Actions or, as the case may be, Further Abuse Actions (through their counsel of record in any such Pending Abuse Action or Further Abuse Action) and any other party that was served with notice of the Motion. Any plaintiff in a Pending Abuse Action or Further Abuse Action may object to the application of such extension of the Termination Date to such plaintiff's Pending Abuse Action or Further Abuse Action by filing with the Bankruptcy Court, within ten (10) business days of the date of an Extension Notice, an objection setting forth the basis for its objection(s) to the Extension Notice (an "Extension Objection"). Upon filing of an Extension Objection by any plaintiff ("Objecting Party"), the expiration

of the Stay Period with respect to such Objecting Party's Pending Abuse Action or Further Abuse Action shall be extended through and including the later of (a) the Termination Date (without giving effect to the extension set forth in the Extension Notice) and (b) date on which the Bankruptcy Court enters an order regarding the Extension Objection. An Objecting Party shall serve any Extension Objection on the undersigned counsel to the Tort Claimants' Committee, the UCC and the BSA, and counsel to any affected BSA Related Party or Additional BSA Related Party or their counsel of record. Notwithstanding the filing of an Extension Objection by any plaintiff, the Termination Date shall be extended as to any plaintiff who does not object to the Extension Notice.

Consent Order ¶ 12.

20.     On May 18, 2020, the Court entered the *Stipulation and Agreed Order by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Extending the Termination Date of the Standstill Period Under the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362* [Adv. D.I. 72] (the "**First Stipulation and Agreed Order**"). The First Stipulation and Agreed Order extended the Termination Date up to and including June 8, 2020. First Stipulation and Agreed Order ¶ 3.

21.     On June 9, 2020, the Court entered the *Second Stipulation and Agreed Order by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 and Further Extending the Termination Date of the Standstill Period* [Adv. D.I. 77] (the "**Second Stipulation and Agreed Order**"). The Second Stipulation and Agreed Order extended the Termination Date up to and including November 16, 2020, and modified the process by which the Termination Date may be further extended. Second Stipulation and Agreed Order ¶¶ 5, 8.

9

22.     Specifically, for further extensions of the Termination Date beyond November 16, 2020, the Second Stipulation provides that paragraph 12 of the Consent Order shall be replaced with the following procedures:

> The Termination Date may be extended by either (1) mutual agreement among the BSA, the UCC and the TCC, which shall be memorialized in a stipulation filed with the Court (an "Extension Notice"); or (2) motion filed by the BSA (an "Extension Motion"), which, in either case, shall be filed no later than twenty-five (25) days prior to the Termination Date and served on plaintiffs to Pending Abuse Actions or, as the case may be, Further Abuse Actions (through their counsel of record in any such Pending Abuse Action or Further Abuse Action) and any other party served with notice thereof. Any plaintiff in a Pending Abuse Action or Further Abuse Action may object to such extension of the Termination Date as to such plaintiff's Pending Abuse Action or Further Abuse Action by filing with the Bankruptcy Court, within fourteen (14) days of the date of an Extension Notice or Extension Motion, an objection setting forth the basis for its objection (an "Extension Objection"). An Objecting Party shall serve any Extension Objection on the undersigned counsel to the TCC, the UCC and the BSA, and counsel to any affected BSA Related Party or Additional BSA Related Party or their counsel of record. No more than seven (7) days following the deadline by which Extension Objections must be filed, the BSA, the UCC, the TCC, and Local Council Committee shall be authorized to file a single omnibus reply to any Extension Objections filed with the Bankruptcy Court. Notwithstanding the filing of an Extension Objection by any plaintiff, the Termination Date shall be extended as to any plaintiff who does not object to the Extension Notice.

*Id.* ¶ 8.

23.     On October 22, 2020, the BSA and the Committees filed with the Bankruptcy Court the *Third Stipulation by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 and Further Extending the Termination Date of the Standstill Period* [Adv. D.I. 107-1] (the "**Third Stipulation**").

10

24.     On November 18, 2020, the Bankruptcy Court approved the *Third Stipulation, entering the Order Approving Third Stipulation by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a  Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 Further Extending the Termination Date of the Standstill Period* [Adv. D.I. 116] (the "**Order Approving Third Stipulation**"), which extended the Termination Date up to and including March 19, 2021.

25.     In accordance with the procedures set forth in the Consent Order, as modified by the First Stipulation and Agreed Order, the Second Stipulation and Agreed Order, and the Order Approving Third Stipulation, the BSA now seeks to extend the Termination Date up to and including July 19, 2021, for the reasons set forth further below.

## V.    OTHER CASE DEVELOPMENTS

26.     Since the BSA instituted this adversary proceeding and filed the Preliminary Injunction Motion, the Debtors have been diligently pursuing the dual imperatives of providing equitable recoveries for survivors of abuse and maintaining the viability of the BSA as a charitable organization.  To that end, early in these Chapter 11 Cases, the Debtors undertook various actions, including:   (a) establishing and populating an electronic data room with information regarding the BSA's and the Local Councils' assets, including any restrictions on such assets; (b) encouraging the formation of an Ad Hoc Committee of Local Councils of the Boy Scouts of America (the "**Ad Hoc Committee**") comprised of eight Local Councils of various sizes from every region of the country; (c) engaging an independent third-party representative for future abuse claimants; (d) filing a motion to establish comprehensive procedures for providing notice of the applicable bar dates to the Debtors' creditors and for

11

creditors, including abuse victims, to file proofs of claim; (e) filing a motion seeking the appointment of mediators and for the referral to mediation (the "**Mediation**") of all issues related to a global settlement of abuse claims through a consensual plan of reorganization; (f) filing a plan of reorganization that provides a framework for the negotiation of a global resolution of abuse claims asserted against the BSA and a comprehensive restructuring of the BSA; and (g) removing any Pending Abuse Action that was pending in a state court as of the Petition Date to its corresponding federal district court (or bankruptcy court, depending upon the applicable local rules).  Preliminary Inj. Mot. Opening Br. at 4-5.

27.    More recently, since entry of the Third Stipulation, the BSA has, among other things, undertaken extensive analysis, with the assistance of its professionals, of the more than 95,000 abuse claims filed by the Bar Date, including leading numerous mediation sessions to present and discuss the results of that analysis.  Whittman PI Extension Decl. ¶ 15.  Further, the BSA and its professionals have completed appraisals of more than 220 Local Council-owned properties and engaged in extensive discussions with the Ad Hoc Committee regarding the terms of potential Local Council participation in a global resolution to be implemented through the BSA's chapter 11 plan.  *Id.* ¶ 11.  The BSA has also cooperated with the TCC, which has appraised more than 400 additional Local Council-owned properties.  *Id.*  The BSA has also helped facilitate the production of approximately 327,000 pages of documents to the TCC, with the steadfast cooperation of the Local Councils, regarding Local Councils' assets, the nature of restrictions thereon, and historical transactions.  *See id.* ¶ 4. Additional details regarding recent developments, and the Debtors' efforts and progress in connection therewith, are provided below.

A.    **The Ongoing Mediation**

28.    As noted above, the Debtors initiated the mediation process along with the commencement of the Chapter 11 Cases.  Specifically, on February 18, 2020, the Debtors filed their *Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 17] (the "**Mediation Motion**").  On June 9, 2020, the Court entered an order on the Mediation Motion.  *See Order Appointing Mediators, Referring Certain Matters to Mediation, and Granting Related Relief* [D.I. 812] (the "**Mediation Order**").  The Court appointed the Honorable Kevin Carey (Ret.), Paul Finn, and Timothy Gallagher as mediators (collectively, the "**Mediators**") for the purpose of mediating a comprehensive resolution of issues and claims in these Chapter 11 Cases through a plan, which includes, without limitation, all matters that may be the subject of a motion seeking approval by the Court of solicitation procedures and/or forms of plan ballots, a disclosure statement, or plan confirmation.  *See generally* Mediation Order.

29.    As part of the Mediation Order, the Court referred the following parties (collectively, and subject to additions, the "**Mediation Parties**") to mediation:  (a) the Debtors; (b) the Ad Hoc Committee; (c) the Future Claimants' Representative; (d) the TCC, including its members, professionals, and the individual members' professionals; (e) the UCC, including its members, professionals, and the individual members' professionals; and (f) each of the insurers set forth on Exhibit 1 to the Mediation Order (the "**Insurers**").  Mediation Order ¶ 3.  The Mediation Order further provided mechanisms by which additional parties may join the mediation.  *See id.*

30.    Shortly after the Court appointed the Mediators, certain of the Insurers sought reconsideration of the Mediation Order, which the Court denied on July 14, 2020.  *See Order*

13

*Denying Motion for Reconsideration* [D.I. 1019].  As a practical matter, the Mediation has only been up and running since the Bankruptcy Court denied the Insurers' motion for reconsideration of the Mediation Order.  *See* Whittman PI Extension Decl. ¶ 8.

31.     In addition, on August 26, 2020, the Coalition of Abused Scouts for Justice (the "**Coalition**") moved to participate in the Mediation.  *See Motion of the Coalition of Abused Scouts for Justice to Participate in the Mediation* [D.I. 1161] ("**Coalition's Participation Motion**").  On October 23, 2020, the Court granted the Coalition's Participation Motion, *see Order Approving the Motion of the Coalition for Abused Scouts for Justice to Participate in the Mediation* [D.I. 1573], which was a significant step forward in plan negotiations.  *See Court-Appointed Mediators' Statement Related to Motions of the Coalition of Abused Scouts for Justice (A) for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement and (B) to Participate in the Mediation* [D.I. 1500] (stating that the "absence of the Coalition as a mediation party has and will continue to hinder the Mediators' efforts to guide the parties to a place of consensus").

32.     There are currently twenty-two (22) Mediation Parties—with at least two additional parties in the process of being admitted to the Mediation—and the Mediators set an ambitious schedule for negotiations.  Feb. 17, 2021 Omnibus Hr'g Tr. 11:3-9 [D.I. 2240]; Whittman PI Extension Decl. ¶¶ 9-10.  Both the Mediators and the Mediation Parties are hard at work under tremendous time pressure, as the BSA undertakes every effort to emerge from bankruptcy in the summer of this year.  Feb. 17, 2021 Omnibus Hr'g Tr. 11:4-9; 11:12-18 [D.I. 2240]; Whittman PI Extension Decl. ¶ 10.

14

33.     The complexity and sheer number of issues that must be addressed in connection with a global resolution cannot be understated.  Whittman PI Extension Decl. ¶ 10.  The Debtors and the Mediators have been taking numerous steps, with the involvement of the other Mediation Parties, to address these issues as they engage in intensive negotiations regarding the structure and terms of a chapter 11 plan.  Feb. 17, 2021 Omnibus Hr'g Tr. 11:6-9 [D.I. 2240]; Whittman PI Extension Decl. ¶ 10.  The Debtors are committed to building consensus through mediated negotiations rather than value-destructive litigation.[4]   Whittman PI Extension Decl.  ¶ 13. However, those negotiations were not able to meaningfully progress in full until several weeks after the Bar Date, when the relevant parties obtained access to more comprehensive information regarding abuse claims.  *Id.*

### B.     Passage of the Bar Date and Ongoing Claims Evaluation

34.     The Bar Date occurred on November 16, 2020 (the "**Bar Date**").  *See Order, Pursuant to 11 U.S.C. § 502(B)(9), Bankruptcy Rules 2002 and 3003(C)(3), and Local Rules 2002-1(E), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors* [D.I. 695] (the "**Bar Date Order**").  As of the Bar Date, claimants had filed more than 95,000 abuse claims against the Debtors.  Whittman PI Extension Decl. ¶ 14.  The Debtors, with the assistance of their advisors, have reviewed the Pending Abuse Actions and Further Abuse Actions filed under the legal name of the abuse survivor, and it appears that virtually all of the plaintiffs in such actions have filed abuse proofs of claim.  *Id.* ¶ 16.  Moreover, the attorneys in cases where the plaintiff used a

---

[4] To that end, as recently explained, the Debtors have been able to consensually resolve a variety of issues in these cases without the need for intervention of the Court.  Feb. 17, 2021 Omnibus Hr'g Tr. 10:22-25; 11:1-2 [D.I. 2240].

"Doe" or equivalent pseudonym generally file claims on behalf of their clients, so it is reasonable to assume that the plaintiffs in those actions have also filed claims in the bankruptcy. *Id.*

35.    In addition to the tens of thousands of abuse claims, more than 15,000 general proofs of claim were filed as of the Bar Date, which include approximately 14,000 claims filed by Local Councils and Chartered Organizations for contribution and/or indemnity, based on shared insurance or other asserted legal bases, and the inextricably intertwined allegations against the BSA and BSA Related Parties in actions brought by abuse victims. *Id.* ¶ 17.

36.    Reviewing the large volume of highly sensitive and fact-specific abuse claims filed in these Chapter 11 Cases requires significant time and resources devoted to analysis. *Id.* ¶ 18.  The Debtors and their professionals have made substantial progress in analyzing the claims, including a series of meetings between the Debtors' representatives, including their economic consultant, Bates White, and the Mediation Parties. *Id.* ¶ 19.  These sessions have been ongoing since early January 2021 and are continuing during the week of this filing. *Id.*  Although substantial progress has been made toward achieving a global resolution of abuse claims and the Mediation Parties now have voluminous data regarding the abuse claims asserted in proofs of claim, significant additional work remains to be done to reach agreement upon the terms of a settlement with a critical mass of abuse survivors and other constituencies. *Id.* ¶ 20. Accordingly, it is as essential as ever that the attention of the Mediation Parties be undivided and free of unnecessary distraction. *Id.*

37.    The Debtors need continued breathing room to further analyze claims data, engage with their stakeholders in mediated plan negotiations, and prepare, file, and solicit a confirmable chapter 11 plan. *Id.* ¶ 22.  The Debtors intend to file an amended plan of reorganization, disclosure statement, and solicitation procedures motion in the very near term

with a view toward obtaining approval of the disclosure statement in April 2021 and plan confirmation by August 2021.  These efforts would be wasted if the Termination Date is not extended, as the BSA Related Entities will be cast back into the tort system to defend against hundreds (if not thousands) of lawsuits.

38.     In all of these ways, the Debtors are proceeding apace toward a successful reorganization.  The Debtors have taken numerous productive steps in furtherance of that end, despite various challenges, including additional hurdles imposed by the ongoing COVID-19 pandemic.  *Id.* ¶ 21.  In order to stay on track, a continued injunction preventing the prosecution of the Pending Abuse Actions and Further Abuse Actions while the Mediation is underway is absolutely critical.  The BSA now requests such relief accordingly.

## **LEGAL ARGUMENT**

## I.     **THE COURT HAS SUBJECT MATTER JURISDICTION**

39.     The Court has jurisdiction to consider the relief requested in this Motion.  As explained further in connection with the Preliminary Injunction Motion and previously herein, the Debtors' estates would be directly and negatively affected if the Pending Abuse Actions and Further Abuse Actions were permitted to continue absent the injunction.  The effects on the Debtors' estates are certainly "conceivable," *see Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), based on the BSA and BSA Related Parties' identity of interests, their shared insurance, and the intertwined nature of the actions against them, including common factual and legal questions presented.  *See* Preliminary Inj. Mot. Opening Br. at 39-46; *see also Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for Preliminary Injunction as to LG 37 DOE Abuse Action* [D.I. 62] (holding the Court has related-to jurisdiction over the claims against the BSA Related Parties in the LG 37 Doe Abuse Action).  The effects on the

estates are evidenced not only through the intertwined allegations contained in the Pending Abuse Actions and Further Abuse Actions themselves, but also through the common allegations contained in the proofs of claim filed in these Chapter 11 Cases.  Accordingly, the Court has subject matter jurisdiction, and the only remaining question is whether the existing injunction should be further extended as requested in this Motion.

## II.    THE INJUNCTION SHOULD BE FURTHER EXTENDED

40.    The facts support further extending the Termination Date as requested by the BSA.  As described previously herein and explained further below, the Debtors have been and will continue pursuing various efforts in connection with the Mediation and overall administration of these matters that are dependent on the injunction continuing for a sufficient period of time.  As with the BSA's initial request for issuance of the injunction, recent developments in the matter continue to support the conclusion that injunctive relief is warranted. This is true under both the "unusual circumstances" test applied by bankruptcy courts to requests for injunctive relief against non-debtors under 11 U.S.C. § 105(a) and the traditional four-factor test for injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

### A.    "Unusual Circumstances" Continue to Warrant Extending the Stay

41.    In addition to the automatic stay's application to the debtor, courts have exercised their equitable powers to fashion relief to extend the protections of the automatic stay to non-debtors in "unusual circumstances."  *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986); *see also* Preliminary Inj. Mot. Opening Br. at 20-33.  Such unusual circumstances exist where either:  (1) "the nondebtor and debtor share an identity of interest such that a suit against the nondebtor is essentially a suit against the debtor"; or (2) "the third-party action will have an adverse impact on the debtor's ability to reorganize."  *In re W.R. Grace & Co.*, 386 B.R. 17, 30

(Bankr. D. Del. 2008).  The critical inquiry is whether allowing the action sought to be enjoined to continue would "defeat the very purpose and intent" of section 362.  *Midway Games, Inc. v. Anonuevo (In re Midway Games)*, 428 B.R. 327, 334 (Bankr. D. Del. 2010); *see also McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997) (automatic stay applied to bank's deficiency judgment action against non-debtor where debtor would have been a necessary party to such action, which "would defeat the purpose of § 362 to centralize all prebankruptcy civil claims against a debtor in the bankruptcy court").  "Unusual circumstances" continue to be present in this case such that an extension of the protections of the automatic stay over the BSA Related Parties remains both appropriate and necessary, as further described below.

1.    The BSA Related Parties Share an Identity of Interests with the Debtors

42.    As previously explained in the Preliminary Injunction Motion, the BSA and the BSA Related Parties all share a single, common purpose:  to facilitate the delivery of the Scouting program consistent with the provisions of the BSA's congressional charter.  *See* Preliminary Inj. Mot. Opening Br. at 22-27.  The close affiliation between the BSA and the BSA Related Parties, and their devotion to a shared single charitable mission, establishes an identity of interest, such that a judgment against the BSA Related Parties in any of the Pending Abuse Actions or Further Abuse Actions "would in effect be a judgment or finding against" the Debtors.  *W.R. Grace*, 386 B.R. at 31.

43.    Additionally, the BSA is the real party defendant in, and has assumed a lead role in defending, the Pending Abuse Actions and Further Abuse Actions.  A debtor is the "real party defendant" in litigation against a non-debtor where the debtor is likely to play a significant role in such litigation.  *See In re Phila. Newspapers, LLC*, 407 B.R. 606, 615 (E.D. Pa. 2009) (finding identity of interests in part because debtor had consistent past practice of defending non-debtor

employees); *see generally In re R & G Fin. Corp.*, 441 B.R. 401, 410 (Bankr. D.P.R. 2010) (finding debtor was "real party in interest" in proceeding against defunct wholly-owned subsidiary where debtor would "have to prepare and incur all legal defense fees and may ultimately be liable depending on the outcome" of the claims). Here, the BSA's own conduct and operations are at the core of the complaints in the Pending Abuse Actions and Further Abuse Actions. *See generally, e.g.*, *Declaration of Bruce A. Griggs in Support of the BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Adv. D.I. 11] Exs. A-F; Whittman PI Extension Decl. ¶ 7. Moreover, in essentially all prepetition abuse actions, the BSA has been in charge of handling and coordinating the litigation on behalf of itself and the BSA Related Parties. *See Declaration of Brian Whittman in Support of the BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 f the Bankruptcy Code* [Adv. D.I. 8] ("**Whittman PI Declaration**") ¶¶ 16-19; Whittman PI Extension Decl. ¶ 7. Indeed, this Court has already recognized "the central role which BSA has taken in defending all of the abuse lawsuits." *See* Mar. 30, 2020 Hr'g Tr. 18:14-18 [Adv. D.I. 55]. Finally, the numerous proofs of claim recently filed in these Chapter 11 Cases further crystallize the intertwined nature of the allegations against the Debtors and the BSA Related Parties. Together, this firmly demonstrates an identity of interest sufficient to support a continued injunction.

2. <u>Continuation of the Pending Abuse Actions and Further Abuse Actions Would Adversely Impact the Debtors' Ability to Reorganize</u>

44.     Further supporting an extension of the injunction is the fact that, without it, the Debtors will face substantial difficulties in reorganizing. *See generally* Preliminary Inj. Mot. Opening Br. at 27-33. Actions against non-debtors are properly stayed "where stay protection is essential to the debtor's efforts of reorganization." *McCartney*, 106 F.3d at 510. Here, the stay

20

of the Pending Abuse Actions and Further Abuse Actions remains essential to the Debtors' efforts to reorganize because:  (1) the BSA and the BSA Related Parties share insurance policies; (2) the BSA is obligated to pay certain deductibles with respect to claims against the BSA Related Parties; (3) absent a stay, the BSA faces substantial risk of collateral estoppel, record taint, and evidentiary prejudice; and (4) absent a stay, the BSA will be required to divert substantial resources from its reorganization efforts towards the Pending Abuse Actions and Further Abuse Actions.

45.    <u>First</u>, as explained in detail in connection with the Preliminary Injunction Motion, the BSA Related Parties share insurance with the BSA as additional or named insureds  the BSA's policies.  *See* Preliminary Inj. Mot. Opening Br. at 43-44; Whittman P.I. Extension Decl. ¶ 5.  Because they share from the same pool of insurance coverage, a judgment against a BSA Related Party has a direct and immediate impact on the BSA and its estate.  Indeed, BSA Related Parties have filed more than 14,000 proofs of claim for contribution and indemnity based on shared insurance.  Whittman P.I. Extension Decl. ¶ 17.

46.    <u>Second</u>, as a result of the shared insurance, the BSA is obligated to pay certain deductibles with respect to claims against the BSA Related Parties.  In the context of the BSA's "fronting" policies, which are policies where the deductibles match the policy's limit of liability, this means that the BSA can be obligated to pay a $1 million deductible under the CGL Policies, and as much as a $9 million deductible under the umbrella policies, for claims against BSA Related Parties.  *See* Preliminary Inj. Mot. Opening Br. at 12; Whittman PI Declaration ¶ 9.

47.    <u>Third</u>, the BSA faces substantial risk of adverse consequences should the Pending Abuse Actions and Further Abuse Actions, which overwhelmingly arise out of a common nucleus of operative facts and raise overlapping legal issues with these Chapter 11 Cases and the

numerous abuse claims filed therein, be permitted to proceed in the tort system. This would leave the BSA in the position of being forced to forfeit the protection of the automatic stay in order to protect its own interests and avoid the risk of being unfairly prejudiced by evidentiary rulings, factual findings, or legal determinations rendered in those actions. *See, e.g.*, *SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*, 388 B.R. 579, 585 (Bankr. D. Del. 2008) (extending automatic stay to action against non-debtor where the risk of the preclusive effects of such action would otherwise compel the debtors to participate); *W.R. Grace*, 386 B.R. at 35 (expanding preliminary injunction and taking account "risks of collateral estoppel and record taint"). The BSA also faces the risk of being bound by multiple, and invariably inconsistent, determinations of common threshold issues—like the distinction between restricted versus non-restricted assets, the estimation of assets and liabilities, the propriety of extending statutes of limitations, and the admissibility of certain evidence—which could result in enormous liability for the BSA's estate and an inequitable distribution of the estate's assets to victims.

48.    Fourth, it is now as important as ever that the Debtors be able to focus their efforts on the evaluation of proofs of claim, the related Mediation, the plan process, and ultimately achieving a consensual global resolution of these Chapter 11 Cases. In particular, the Debtors expect significant developments in the Mediation process, which is extraordinarily active, with Mediation sessions occurring on a near-daily basis. Feb. 17, 2021 Omnibus Hr'g Tr. 11:3-9 [D.I. 2240]. The Debtors are also aiming to file an amended disclosure statement and plan in the very near term. *See* Feb. 17, 2021 Omnibus Hr'g Tr. 11: 12-20 [D.I. 2240]. It therefore remains important that, at this critical juncture, the Debtors not be forced to divert resources away from those efforts, which would occur if the Pending Abuse Actions and Further

Abuse Actions were no longer enjoined.  An extension of the Termination Date is therefore necessary to protect the Debtors' ability to reorganize.

### B.    The Traditional Elements for Injunctive Relief Continue to be Satisfied

49.    Injunctive relief also continues to be warranted under the traditional four-factor test for granting such relief.  Under that test, courts consider the debtor's reasonable likelihood of success; the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; the balance of harms between the debtor and its creditors; and the public interest in an injunction.  *See W.R. Grace*, 386 B.R. at 33; *Martillo v. Paladini (In re CD Liquidation Co.),* 462 B.R 124, 134 (Bankr. D. Del. 2011).  Applying these factors to the facts of this case, this Court should extend the existing injunction as requested herein.

### 1.    The Debtors are Likely to Successfully Reorganize

50.    In the bankruptcy context, the "likelihood of success" factor has been understood to require consideration of "the debtor's ability to successfully reorganize."  *Lane v. Phila. Newspapers, LLC (In re Phila Newspapers, LLC)*, 423 B.R. 98, 106 (E.D. Pa. 2010); *see also W.R. Grace*, 386 B.R. at 33 (successful reorganization remained likely "despite seven years in chapter 11" where evidence showed the "parties are working toward plan confirmation"); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs., Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009) (reorganization "proceeding on track" was sufficient); *Bank of the W. v. Fabtech Indus. (In re Fabtech Indus.),* 2010 Bankr. LEXIS 5097, *12-15 (B.A.P. 9th Cir. 2010) (only a "reasonable likelihood of reorganization" need be demonstrated); *see also* Preliminary Inj. Mot. Opening Br. at 34-35.

51.    Here, the Debtors have already undertaken various significant and crucial steps toward a successful reorganization, and dozens of parties in interest are actively working

together toward that end.  This remains true notwithstanding the TCC's refusal to cooperate in

further extending the Termination Date.  Accordingly, this factor favors extending the injunction.

### 2.    Without the Injunction, the Debtors Would be Irreparably Harmed

52.    Without an extension of the Termination Date, the Debtors and their estates will

suffer immediate, irreparable harm.  *See generally* Preliminary Inj. Mot. Opening Br. at 35-38.

In the context of a bankruptcy case, irreparable harm exists when the action sought to be

enjoined "could interfere with the reorganization of the debtor or would interfere with, deplete or

adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter

11 or diminish [the debtor's] ability to formulate a plan of reorganization."  *W.R. Grace*, 386

B.R. at 34 (alterations in original; internal quotation marks and citation omitted); *see also*

*Lyondell*, 402 B.R. at 590 (irreparable harm shown where "the action sought to be enjoined

would embarrass, burden, delay or otherwise impede the reorganization proceeding, or if a stay

is necessary to preserve or protect the debtor's estate and reorganization prospects" (internal

quotation marks and citation omitted)).

53.    Unless the Pending Abuse Actions and Further Abuse Actions continue to be

enjoined, the Debtors' reorganization efforts will be adversely impacted in a number of ways.

First, as noted above and further described in connection with the Preliminary Injunction Motion,

the BSA and BSA Related Parties share insurance policies.  *See* Preliminary Inj. Mot. Opening

Br. at 27-29.  Because the BSA Related Parties are either additional or named insureds under the

BSA's insurance policies, *see* Preliminary Inj. Mot. Opening Br. at 43-44; Whittman P.I.

Extension Decl. ¶ 5, any judgment or liability resulting from the continuation of the Pending

Abuse Actions against the BSA Related Parties threatens to deplete estate assets that are essential

to the Debtors' reorganization and the equitable treatment of all abuse victims.  In other words,

the continuation of the Pending Abuse Actions creates a "substantial risk . . . of an immediate liquidated claim against [the] Debtors" sufficient to establish imminent, irreparable harm to the Debtors' prospects for a successful reorganization. *See W.R. Grace*, 386 B.R. at 34.  The fact that various BSA Related Parties filed proofs of claim in these Chapter 11 Cases makes this risk pellucid.

54.    <u>Second</u>, as also noted above and explained in the Preliminary Injunction Motion, the BSA faces substantial risks of collateral estoppel, record taint, and evidentiary prejudice unless the Pending Abuse Actions and Further Abuse Actions are stayed. *See, e.g.*, Preliminary Inj. Mot. Opening Br. at 29-31; Mar. 30, 2020 Hr'g Tr. 18:19-23, 19:4-9 [Adv. D.I. 55] (observing that the factual and legal basis of a plaintiff's abuse claim against a local council is "identical" to and "inextricably intertwined" with that plaintiff's claim against the BSA, and finding that such similarity makes record taint, collateral estoppel, and evidentiary prejudice "material risks if the case goes forward").  These risks are sufficient to establish the irreparable harm justifying injunctive relief.  *See* Aug. 16, 2017 Hr'g Tr. 27:7-13, *TK Holdings, Inc. v. Hawaii (In re TK Holdings, Inc.)*, Adv. No. 17-50880-BLS (Bankr. D. Del. Aug. 23, 2017) [Adv. D.I. 64-3] (finding irreparable harm where "the task of monitoring hundreds of lawsuits and the prospect of what's been collectively described as record taint including collateral estoppel are material risks for these debtors"); *see also Lomas Fin. Corp. v. Northern Tr. Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 67 (S.D.N.Y. 1990) (finding "irreparable harm" where debtor's key personnel would be forced to participate in such litigation to avoid the "threat of collateral estoppel").  Thus, absent the requested relief, the BSA would be thrown into a no-win situation: either participate in the Pending Abuse Actions and Further Abuse Actions and thereby destroy value that would otherwise be available for abuse victims, or allow those actions to proceed

without it, and potentially face binding judgments that would affect claims against its estate without an opportunity to adequately defend itself, thereby imperiling the Local Councils that are essential to the delivery of Scouting and national revenues and the BSA's own reorganization prospects.

55.    <u>Third</u>, as also previously explained, continuation of the Pending Abuse Actions and Further Abuse Actions will divert critical resources and key personnel away from the Debtors' reorganization efforts.  *See* Whittman PI Decl. ¶¶ 20-23.  This further shows a substantial risk of irreparable harm, supporting continuance of the injunction.

3.    <u>The Balance of Harms Weighs in the Debtors' Favor</u>

56.    The balance of harms also supports the continued force of the injunction. *See generally* Preliminary Inj. Mot. Opening Br. at 37-38.  Any speculative prejudice involved in asking victims to delay prosecuting their actions against the BSA and the BSA Related Parties in other fora is outweighed by the harm all parties in interest would suffer absent a stay.  This includes harm to abuse claimants, in whose interest the TCC is supposed to be acting.  *See generally In re Celotex Corp.*, 123 B.R. 917, 920 (Bankr. M.D. Fla. 1991) ("A creditors committee has a fiduciary duty to the individual members that committee represents.  Counsel for the committee has a fiduciary duty to the committee and its constituency.  These fiduciary duties cannot be misdirected by the relationship of the committee's counsel with other entities that have other considerations than the committee or its constituency." (citations omitted)).

57.    Without the stay, the Debtors would be unable to equitably compensate all abuse victims through an efficient, global resolution achieved via the Mediation and plan process.  Indeed, the Court has previously recognized that a "piecemeal approach to litigation" would

cause "harm to [the] debtor and other players in the bankruptcy case." Mar. 30, 2020 Hr'g Tr. 20:8-12 [Adv. D.I. 55]. Accordingly, this factor also supports granting the requested relief.

4.    The Public Interest Favors the Requested Relief

58.    Finally, the public interest, including the interest in supporting successful reorganizations, overwhelmingly supports the injunction. *A.H. Robins*, 788 F.2d at 1008 (the "unquestioned public interest in promoting a viable reorganization of the debtor can be said to outweigh any contrary hardship to the plaintiffs"); *Rickel Home Ctrs. v. Baffa (In re Rickel Home Ctrs.*, 199 B.R. 498, 501 (Bankr. D. Del. 1996) ("[T]here is a strong public interest in promoting a successful Chapter 11 reorganization."); Mar. 30, 2020 Hr'g Tr. 21:15-16 [Adv. D.I. 55] ("[T]here is a strong public policy interest in giving BSA space to see if a consensual resolution can be achieved with all victims of abuse."); *see also* Preliminary Inj. Mot. Opening Br. at 38-39. The BSA's longstanding charitable mission and important role in our society only further underscore this conclusion.

## **CONCLUSION**

59.    For the reasons set forth above, the Court should grant the Motion, enter the Proposed Order extending the Termination Date of the preliminary injunction up to and including July 19, 2021, and grant any such other relief as may be just and proper.

*[Remainder of Page Intentionally Left Blank]*

27

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Paige N. Topper*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:   (302) 658-9200
Email:  dabbott@morrisnichols.com
        aremming@morrisnichols.com
        emoats@morrisnichols.com
        ptopper@morrisnichols.com

– and –

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:   (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:   (312) 881-5400
Email:  mandolina@whitecase.com
        mlinder@whitecase.com

*COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION*